SIGNED THIS: April 23, 2012

_____
**Thomas L. Perkins
United States Chief Bankruptcy Judge**

**UNITED STATES BANKRUPTCY COURT
CENTRAL DISTRICT OF ILLINOIS**

| | |
|---|---|
| IN RE: | ) |
| | ) |
| MARK A. HARRIS and | )   Case No. 11-82633 |
| LAURIE D. HARRIS, | ) |
| | ) |
| Debtors. | ) |

**O P I N I O N**

The issue in this case is whether delinquent real estate taxes paid prepetition by a mortgagee may be cured through a chapter 13 plan as a prepetition arrearage notwithstanding that the mortgagee sent the debtor a prepetition RESPA notice increasing the mortgage payments to recoup the advance for the taxes.

The Debtors, Mark and Laurie Harris, filed the chapter 13 petition that initiated this case on October 19, 2011.[1]  The mortgage loan in question was originally obtained by the Debtors from Riverside Finance, Inc., on August 28, 2006.  The Debtors scheduled

---

[1] The Debtors had been in a prior chapter 13 case, No. 07-82658, filed on November 27, 2007, and dismissed on October 18, 2011, on the Trustee's motion for failure to make the plan payments.  The parties make no reference to the prior case in their pleadings, apparently believing it to be immaterial.  The Court accepts that mutual belief without further comment.

Associated Bank, however, as the secured creditor and Associated has filed a proof of claim and pleadings asserting that it is the holder of the mortgage and the mortgage note. Associated represents that the original Riverside Finance note and mortgage are the operative loan documents, which the Debtors do not dispute.[2]

The Debtors also scheduled a third-party tax buyer and Tazewell County on Schedule D with claims secured by a statutory lien on their residence for unpaid real estate taxes for 2006, 2007 and 2010, totaling $15,867. The chapter 13 plan filed by the Debtors proposes to have the Trustee pay the delinquent real estate taxes to the tax buyer and the county and a prepetition arrearage on the mortgage loan to Associated estimated to be $15,000. The plan proposes that the Debtors will pay the regular, postpetition mortgage payments direct to Associated, not through the Trustee, in full, according to the unmodified terms of the mortgage loan. The Debtors propose to fund the plan with payments to the Trustee of $770 for sixty (60) months.

The Riverside mortgage is a non-uniform, non-Fannie Mae mortgage that does not provide for an escrow account for real estate taxes or insurance. (Associated does not claim that it does.) The mortgage requires the Debtors to pay the real estate taxes themselves and to keep the property insured. The Schedule of Current Expenditures (Schedule J) filed by the Debtors lists a monthly expense deduction from their budget of $368 for real estate taxes and $69 for homeowner's insurance. The Debtors also represent on Schedule J that their monthly mortgage payment of $460 does not include any amount for real estate taxes or insurance.

---

[2] Copies of the Riverside note and mortgage are attached to Associated's proof of claim. The record contains no documentation or representation as to when Associated acquired the mortgage and note. In the prior chapter 13 case, the Debtors sought and were granted leave to negotiate a mortgage modification with Associated but, apparently, those negotiations were unsuccessful.

2

The proof of claim filed by Associated asserts a prepetition arrearage of $4,974.38, which includes three delinquent payments for August through October, 2011, of $1,478.71 each. The claim also itemizes, but does not include as part of the arrearage, an "Escrow Shortage" of $15,654.76. Although the claim does not say so, there is no dispute that the Escrow Shortage arises from Associated's prepetition payment of the delinquent real estate taxes.[3] The Debtors object to the claim alleging that they have the right to cure the delinquent taxes through the plan and that Associated is impermissibly attempting to force them to pay the taxes as part of the postpetition mortgage payments. The Debtors also filed a motion to have the Court determine the correct amount of their postpetition mortgage payments to Associated. As a practical matter, the issue is one of feasibility. Curing the taxes through the plan can be accomplished over a longer term so that the monthly amount necessary to effect the cure is less, much less, than the additional thousand dollars per month that Associated wants the Debtors to pay ($1,478.71 minus $460 equals $1,018.71) if the mortgage payment increase is allowed to stand.

In its response, Associated contends that the payment change was effected prepetition and is therefore binding on the Debtors. In support, Associated submits a document dated June 13, 2011, addressed to the Debtors, entitled "Annual Escrow Account Disclosure Statement and Change of Payment Notice" (Escrow Notice). It discloses a new monthly payment effective August 1, 2011, in the amount of $1,478.71, itemized as follows:

| | |
|---|---:|
| Principle and Interest | $ 458.00 |
| Escrow | 368.43 |
| Over/Short | 652.28 |
| Total | $1,478.71 |

---

[3] The parties do not address the discrepancy between the amount of the Escrow Shortage and the real estate tax claim amounts stated in the Debtors' plan and schedules, so neither will the Court. The Debtors' plan is not confirmable as filed, so the amount of the arrearage will be adjusted in an amended plan.

3

The "Escrow" amount of $368.43 is 1/12 of the annual real estate taxes stated as $4,421.18. The "Over/Short" amount of $652.28 is 1/24 of the "Escrow Shortage" amount stated as $15,654.76.

The Escrow Notice does not purport to advise the Debtors that an escrow requirement is being imposed for the first time or why it is being imposed. No other related documents were tendered by Associated. The Escrow Notice merely states that "Associated Loan Services Dept. has completed an analysis of your escrow account, and has adjusted your mortgage payment to reflect changes in your real estate taxes and/or property insurance." The Debtors do not dispute receiving the Escrow Notice in June, 2011, several months before this case was filed.

As pointed out by the Debtors, the Riverside mortgage document does not provide for the escrow of any sums for taxes and insurance, leaving those expenses to be paid direct by the Debtors. Neither does the mortgage give the mortgagee the right to impose an escrow obligation if the Debtors fail to pay the taxes or insurance. The mortgage simply provides that if the Debtors fail to pay the taxes, the mortgagee may pay them whereupon the Debtors are obligated to reimburse the advance. Non-payment of taxes and failure to reimburse advances are events of default that permit the mortgagee to accelerate the debt and foreclose.

It is not clear what statutory basis Associated is relying upon for its nonconsensual imposition of an escrow requirement. Associated refers generally to the Real Estate Settlement Procedures Act (RESPA), 12 U.S.C. § 2601 *et. seq.,* but cites no provision of RESPA or of Regulation X, its implementing federal regulation, that permits a mortgagee

4

to force-place (impose without consent) an escrow requirement in response to a tax payment default where the mortgage and related loan documents do not grant it that right. The Debtors do not concede that RESPA even applies to the mortgage loan originated by a state-chartered finance company.[4] Moreover, Regulation X leaves to other law to determine whether an escrow account may be established where the loan documents do not provide for one. 24 C.F.R. § 3500.17(c)(8). The Illinois Mortgage Escrow Account Act permits a lender to reestablish a terminated escrow account upon a borrower's failure to pay taxes, 765 ILCS 910/8, but is silent as to whether an escrow may be imposed where one was not required or agreed to at the loan's origination. In the absence of statutory authorization, the issue is governed by the terms of the parties' contract. This is not a situation where the mortgage document expressly gives the mortgagee the right to impose an escrow upon a mortgagor's failure to pay real estate taxes. *Cf. Teeuwissen v. JP Morgan Chase Bank, N.A.*, 2011 WL 5593164 (S.D.Miss. 2011) (deed of trust expressly authorized Chase to revoke escrow waiver and require escrow for payment of property taxes). But the Debtors do not seem to challenge Associated's imposition of an escrow requirement for future taxes. They only dispute Associated's use of the escrow requirement as a means to collect the delinquent taxes they concede Associated had already paid. So the Court will limit its decision to that issue.

The Debtors propose to save their house by the classic "cure and maintain" method in chapter 13, by curing the prepetition mortgage arrearage while maintaining the regular

---

[4]RESPA applies to a "federally related mortgage loan," defined to include any loan which is secured by a lien on residential real property, made by a lender that is federally insured or federally regulated, or made by a creditor who makes residential real estate loans aggregating more than $1M per year. 12 U.S.C. § 2602(1).

5

postpetition payments, afforded under section 1322(b)(5). *See Matter of Chappell,* 984 F.2d 775, 780-81 (7th Cir. 1993). Associated admits that it paid the real estate taxes prior to June 13, 2011. By the terms of the mortgage, the Debtors became immediately obligated to pay Associated the amounts it advanced for the taxes. The mortgage gives no right or discretion to Associated or the Debtors to have the advances added to the end of the loan or to otherwise defer payment. When the Debtors filed their petition, the tax advance was due and owing as were several missed payments.

Associated does not dispute that the tax advances were immediately due and payable. It argues that it unilaterally decided, in an exercise of its discretion, to collect the advances by increasing the monthly mortgage payment and that by doing so prepetition, the new, increased payment amount became the amount that the Debtors must "maintain" under section 1322(b)(5).

Under section 1322(b)(5), a debtor has the right to cure "any default." The amount necessary to cure the default is determined in accordance with the underlying agreement and applicable nonbankruptcy law. 11 U.S.C. § 1322(e). The Bankruptcy Code defines "claim" as a "right to payment." 11 U.S.C. § 101(5)(A). Any amount that a creditor had a right to collect under its loan documents constitutes a "claim" under the Bankruptcy Code. *Campbell v. Countrywide Home Loans, Inc.,* 545 F.3d 348, 354 (5th Cir. 2008); *In re Rodriquez,* 629 F.3d 136, 142 (3rd Cir. 2010).

*Campbell* and *Rodriquez* both involve a chapter 13 debtor's allegation that a mortgage servicer violated the automatic stay by seeking to recoup a prepetition escrow shortage via

a postpetition mortgage payment increase rather than including the shortage in the arrearage to be paid through the plan. Both courts determined that a debtor's contractual obligation to make a monthly tax escrow payment was sufficient to support a "claim" by the servicer that was properly treated as a prepetition claim, notwithstanding that the servicer had not yet paid the real estate taxes for which the escrowed funds were intended. The creditors argued that an unpaid liability for sums to be held in escrow to pay future taxes not yet due could not be characterized as a prepetition claim since the underlying debt – the obligation to pay the taxes to the county – had not yet arisen. The courts rejected that argument, focusing instead on the debtor's obligation to fund the escrow account in advance of the due date for the taxes. The argument made by the mortgage servicers in *Campbell* and *Rodriquez* is not available to Associated here, as the taxes in question came due prepetition.

So Associated clearly holds a prepetition claim for reimbursement of its tax payments and it does not contend otherwise.[5] Associated contends that the new, increased mortgage payment that it put into effect prior to the bankruptcy filing, cannot be reversed or undone by the Debtors. Associated disputes the Debtors' ability to force it to accept a cure of the tax advances through the plan as part of the prepetition default amount.

Section 1322(b) lists eleven categories of substantive provisions that a chapter 13 plan may include. These categories are statutory rights that the Bankruptcy Code empowers a debtor to exercise without the consent and over the objection of creditors. One

---

[5] In the *Rodriquez* case, the mortgagee, Countrywide Home Loans, Inc., had made a prepetition advance of $3,869.91 for real estate taxes that the debtors failed to pay. Countrywide conceded that the advance was properly part of the prepetition arrearage that could be cured by the debtors through the chapter 13 plan, seeking only to recoup an escrow reserve or cushion by increasing the postpetition monthly escrow payments to recover the shortfall. 629 F.3d at 137-38.

7

of those rights is to use the plan to cure any default within a reasonable time. 11 U.S.C. § 1322(b)(5). This power is accorded to a debtor "notwithstanding paragraph (2) of this subsection," which prohibits the modification of the rights of a creditor secured only by a mortgage on the debtor's residential real estate. 11 U.S.C. § 1322(b)(2). So section 1322(b)(5) operates as an exception to the antimodification protection of subsection (b)(2), and thus permits a debtor to cure any default notwithstanding that the creditor holds a contrary right that would prevent such a forced cure outside of bankruptcy. *In re East*, 172 B.R. 861 (Bankr.S.D.Tex. 1994).

One of the "rights" accorded Associated by the mortgage is the right to immediate payment of sums advanced to pay delinquent real estate taxes. This right is modifiable in the context of a cure of a default under section 1322(b)(5). *See In re Tudor*, 342 B.R. 540, 564 (Bankr.S.D.Ohio 2005). The mortgage does not give Associated the "right" to do what it did here – collect the advance through a payment increase. Even if the mortgage did so provide, however, that "right" would also be modifiable under section 1322(b)(5). It is important to note that the modification of a mortgagee's rights permitted by section 1322(b)(5) does not equate to an elimination of those rights. Associated's right to be reimbursed for the sums it advanced to pay the taxes is preserved. Only the timing and mechanism of the reimbursement is altered. *See In re Hart*, 184 B.R. 849, 855-56 (Bankr.M.D. Fla. 1995).

It makes no difference that the source of the creditor's "contrary right" is another federal statute, in this case RESPA, as alleged by Associated. The language of section 1322

8

is broad, providing that "the plan may . . . modify the rights of holders of secured claims" (subsec. (b)(2)), and "provide for the curing of any default" (subsec. (b)(5)).  Even more pointedly, the statute provides that "[n]otwithstanding subsection (b)(2) and *applicable nonbankruptcy law* . . . a default with respect to, or that gave rise to, a lien on the debtor's principal residence may be cured under paragraph (3) or (5) of subsection (b) . . . ."  11 U.S.C. § 1322(c)(1).  The rights of a creditor that may be modified to effect a cure of a default include rights granted by contract and by statute, without exception or limitation.

The Fifth Circuit in *Campbell* held that Countrywide's attempt to collect a prepetition escrow shortage, and thus bypass the debtors' cure rights, by recalculating the escrow payments postpetition was subject to the automatic stay.  Countrywide argued that its right to recalculate under RESPA trumped a debtor's powers of modification under section 1322(b)(2).  545 F.3d at 354.  The court framed the issue as whether a RESPA recalculation right "overrides bankruptcy principles."  *Id.* at 353.  The court concluded that Countrywide's RESPA rights were subordinate to the debtors' bankruptcy powers.  The Third Circuit followed *Campbell* in *Rodriquez*.  This Court agrees with the Fifth and Third Circuits.

Associated attempts to draw a distinction as to its position here by relying on the conceded fact that its escrow imposition was effected before the bankruptcy case was filed.  This Court sees no reason why that should make a difference.  The taxes paid by Associated constitute a prepetition claim that was in default when the bankruptcy was filed.  The fact that Associated had imposed an escrow requirement as a mechanism to collect the claim does not alter the nature of the claim as one for a sum due arising from a prepetition default.  As such, the Debtors have the power to use their chapter 13 plan to

9

cure the default through installment payments distributed by the Trustee, and they don't need Associated's consent to do so.  The Court agrees with *In re Beaudet,* 455 B.R. 671 (Bankr.M.D.Tenn. 2011), where the court held that a prepetition claim for unpaid escrow was properly paid as part of the mortgage arrearage through the chapter 13 plan, rejecting the mortgage servicer's attempts to collect it through an increase in the amount of the monthly mortgage payments.

It makes no difference that Associated used an Escrow Notice to cloak the payment increase with the apparent authority of a federal statute.  Associated is doing nothing other than trying to continue postpetition, to forcibly collect a prepetition debt (the same conduct found to be improper in *Campbell* and *Rodriquez),* that the Debtors are entitled to pay through their plan.  Even assuming RESPA applies and assuming Associated's use of the Escrow Notice was proper and permissible under RESPA, Associated's attempt to collect a prepetition arrearage via a nonconsensual payment increase is not shielded by RESPA from the overriding powers given to chapter 13 debtors.  The power the Debtors have under section 1322(b)(5) to cure the tax payment default within a reasonable time through the chapter 13 plan overrides Associated's attempt to force a cure by increasing the Debtors' monthly mortgage payments.

It is important to note that this is not a situation where the parties entered into a prepetition loan modification that provided for a consensual cure of an existing default. If they had, the tax payment default would have been cured before bankruptcy and the repayment terms would have been binding on the Debtors.  *See In re Lammy,* 356 B.R. 168

10

(Bankr.E.D.Pa. 2006); *In re Gellerman,* 263 B.R. 691 (Bankr.D.R.I. 2001). But without a modification agreement, the terms of the mortgage contract define the default that is to be cured and the payments that are to be maintained. *In re Rogel,* 425 B.R. 231, 235 (Bankr.W.D.Pa. 2010). The default is defined by the mortgage to include the taxes paid by Associated. The unilateral act of Associated to force-place an escrow requirement does not change how the mortgage treats the prepetition tax advance – as a default immediately due and payable in full. It is axiomatic that one party to a contract may not modify its terms unless such modification is mutually agreed upon. *Village of Mundelein v. Evanger,* 132 Ill.App.2d 179, 181, 269 N.E.2d 325, 327 (Ill.App. 2 Dist. 1971). The advance for taxes is properly part of the default that the Debtors are entitled to cure through the plan under section 1322(b)(5) notwithstanding the escrow requirement imposed by Associated prepetition.

Associated must back the tax advance out of the current mortgage payment so that the Debtors may include it in the arrearage to be cured through the plan. The Court makes no determination as to whether RESPA applies here or whether Associated may impose an escrow requirement for future taxes, as it is not clear whether the Debtors dispute that. The Debtors' objection to Associated's proof of claim will be granted. The motion to determine mortgage payments will be set for further hearing.

This Opinion constitutes this Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052. A separate Order will be entered.

###